**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-00049-JMC** |
| **KALEB DILLARD,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kaleb Dillard to a high-end sentence of 18 months of imprisonment, three years of supervised release, restitution of $36,238.55, and a mandatory special assessment of $100.

### I.  INTRODUCTION

The defendant, Kaleb Dillard, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.9 million in losses.[1]

Dillard, a former U.S. Marine, stormed the police line on the Rotunda Door and used a

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

metal tool to smash in the window on the door. Dillard then pushed past police through the Rotunda

Door to enter the Capitol. Upon entering, Dillard assaulted one of the officers attempting to close

the Rotunda Door, grabbing the officer from behind and throwing the officer backwards onto the

marble floor. Dillard then repeatedly shoved a second officer away from the doors in an effort to

reopen the doors and allow more rioters to enter.

In their plea agreement, the parties anticipated a Guidelines range of 12 to 18 months

imprisonment, based on an offense level of 13 under U.S.S.G. § 2A2.4 and Dillard's Criminal

History Category I. The government acknowledges that based on applicable case law, the plea

agreement should have accounted for Defendant's commission of the offense with the intent to

commit another felony, which would make it covered by the provision for aggravated assault under

U.S.S.G. § 2A2.2 instead of the provision for obstructing or impeding officers under U.S.S.G.

§ 2A2.4. *See* U.S.S.G. § 2A2.2, cmt. n.1 (defining "Aggravated Assault" as "a felonious assault

that involved . . . an intent to commit another felony"). To be clear, consistent with the plea

agreement, the government is not advocating for the Court to apply the Guidelines under § 2A2.2

for aggravated assault. *See* ECF 26 at 4 ("Except as provided for in the 'Reservation of Allocution'

section below, the parties also agree that neither party will seek any offense-level calculation

different from the Estimated Offense Level calculated above in subsection A."). However, the

parties have "reserve[d] the right to answer any related inquiries from the Court or the presentence

report writer, and to allocute for a sentence within the Guidelines range, as ultimately determined

by the Court, even if the Guidelines range ultimately determined by the Court is different from the

Estimated Guidelines Range calculated herein." *Id.* at 5.

Accordingly, the government recommends that the Court sentence Dillard to 18 months of

2

incarceration, which is the high end of the advisory Guidelines' range of 12 to 18 months. An 18-month sentence is "sufficient but not greater than necessary" to reflect the gravity of Dillard's conduct and the need to deter others from engaging in political violence.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 27, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Breach of the Capitol Building on the East Front and the Rotunda Door*

One of the main points of entry for rioters on January 6, 2021, was through a set of ornate double doors at the top of the Central East Steps. These doors have been referred to as the Columbus Door or the Rotunda Door. The Rotunda Door is often regarded as the main door into the Capitol Building. In Images 1 and 2 below, the Rotunda Door is circled in red.



*Image 1 – Screenshot from https://youtu.be/CqBB3Mt06XA*

3

On January 6, 2021, the outer perimeter of the Capitol Grounds, made of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the United States Capitol Police ("USCP") were stationed nearby as well as patrolling through the grounds. In Image 2, the barricades on the East Front are indicated with dotted lines.



*Image 2: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

On the afternoon of January 6, a crowd gathered on the East Front, outside the perimeter. At about 1:58 p.m., individuals in the northeast corner began to tear down the barricades and move into the East Plaza.



*Image 3: Screenshot from https://youtu.be/z1gODZvbhqs*

Shortly thereafter, rioters began pushing against police and tearing down barriers throughout the perimeter.



*Image 4: Screenshot from Capitol Security Video*

The rioters pressed forward, through the East Plaza.

5



*Image 5: Screenshot from https://youtu.be/185f3LPxUYU*

The USCP established a temporary police line at the base of the East Central steps, but were soon overrun. At about 2:06 p.m., rioters flooded up the steps, between the columns, and on to the surrounding balconies.



*Image 6: Screenshot from Capitol Security Video*

The USCP officers retreated to the Rotunda Door, and were surrounded. Rioters attacked them with sticks, fists, flag poles, and tear gas before they escaped the area.

6



*Images 7 and 8: Screenshots from https://youtu.be/MVullQb-Lec*

Rioters outside the Rotunda Door attacked the police and tried to break in, smashing the windows in the process. At about 2:25 p.m., a rioter already inside the Capitol opened the door from the inside. Rioters rushed through the door, as others tried to jam a flag through the door to keep it open. Other members of the exterior crowd assaulted officers who stood with their backs to the Rotunda Door, defending it.



*Images 9 and 10: Screenshots from Capitol Security Video*

Rioters fought officers to keep the door open, pushing and pulling them out of the way, trying to jam their bodies in the doorframe. Officers succeeded in closing the door at approximately 2:28 p.m., after one officer hurled himself through the door and turned his back to the crowd, pushing them back just enough to allow space for the door to close.



*Image 11: Screenshot from Capitol Security Video*

While officers stood guard at the doors, and then barricaded the door with benches, tensions remained high. Rioters outside continued yelling and chanting and skirmishing with officers, trying to breach the doors again. At about 2:37 p.m., rioters from the Rotunda moved towards the doors in an effort to open them, while USCP officers rushed to guard the doors from the inside.



*Image 12: Screenshot from Capitol Security Video*

At about 2:39 p.m., the rioters pushed forward, crushing the police, and forcing the doors open again.

8



*Image 13: Screenshot from Capitol Security Video*

Once the doors had been breached, and as a security alarm blared, hundreds of rioters poured into the building and past overwhelmed USCP officers, who were pinned against the door.



*Image 14: Screenshot from Capitol Security Video*

Rioters continued to push through the Rotunda Door for another hour, battling with police over control of the doors. A combined force of USCP and MPD officers were finally able to secure the Rotunda Door at around 3:30 p.m.



*Image 15: Screenshot from Capitol Security Video*

**B.      Injuries and Property Damage Caused by the January 6, 2021 Attack**

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27–30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-

AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than $2.9 million.

### C.    Dillard's Role in the January 6, 2021 Attack on the Capitol

*Approach to the Capitol*

Dillard traveled with a family member to Washington, D.C., by car from his home in Alabama. When they arrived in the Washington, D.C. area, they met a friend who lived in the Washington, D.C. area. The three attended the "Stop the Steal" rally and thereafter marched to the Capitol.

When he arrived, Dillard then approached the Capitol Building from the east and pushed to the head of the crowd outside the Rotunda Door, where rioters were pushing up against officers attempting to secure the doors. The following is a screenshot from Exhibit 1, which is a clip taken from Capitol Security Video, with Dillard circled in red.



*Image 16: Still from Exhibit 1 at :08*

Dillard then used a metal tool and smashed one of the windows in the Rotunda Door.



*Image 17: Still from Exhibit 1 at 0:36*

Dillard continued to smash at the window with the metal tool. The following is a still image from Exhibit 2, which is a clip taken from an open-source video from the other side of the Rotunda Door. Dillard is circled in red.



*Image 18: Still from Exhibit 2 at :35*

**Breach of the Capitol Building and Dillard's Entry into the Capitol**

By virtue of being at the frontline of the rioters, Dillard was nearby when a rioter already

inside the Capitol opened the Rotunda Door at about 2:25 p.m.



*Image 19: Still from Exhibit 1 at 5:12, approximately two minutes prior to Dillard's entry,*
*showing a rioter opening the Rotunda Door from the inside*

At about 2:26 p.m., Dillard was among the first group of rioters to enter the Capitol through

the Rotunda Door breach.



*Image 20: Still from Exhibit 1 at 7:03*

14

### *Dillard's Assault of Capitol Police Officers*

Approximately fifteen seconds after entering the Capitol, Dillard approached Officer B.A., who was attempting to close the Rotunda Door and stop rioters from entering. Dillard grabbed Officer B.A.'s protective vest from behind and threw Officer B.A. backwards to the marble floor below. Officer B.A. hit the marble floor with his head and shoulders first before sliding into a metal bench. *See* Exhibit 1 at 7:18.



*Image 21: Still from Exhibit 1 at 7:25 (Dillard in Red, Officer B.A. indicated with green arrow)*

The violence and speed of Dillard's assault is captured in Exhibit 3, which is a clip from media footage. *See* Exhibit 3 at :52–:55. After being slammed to the ground, Officer B.A. lay there for almost ten seconds until he was helped up by another officer and brought to the side of the

room. *See* Exhibit 3 at 1:05–1:22.



*Image 22: Still from Exhibit 3 at 1:18*

Dillard then went to help more rioters come inside the Rotunda Door.



*Image 23: Still from Exhibit 1 at 7:48*

Dillard was not finished with his attacks. Seconds after his assault on Officer B.A., Dillard

approached USCP Officer A.W., who, like Officer B.A., was trying to secure the Rotunda Door

16

from the rioters. Dillard repeatedly shoved Officer A.W. away from the doors so more rioters could enter. *See* Exhibit 1 at 12:35.



*Image 24: Still from Exhibit 1 at 7:54 (Dillard in Red, Officer B.A. indicated with green arrow)*

Unable to move Officer A.W. away from the door, Dillard continued to harrass him, sticking his fingers in Officer A.W.'s face, and at one point screaming, "That's a poor excuse! 'I got a job to do.' Give me a fucking break!" *See* Exhibit 3, at 2:17–2:30.



*Images 25 and 26: Stills from Exhibit 3 at 2:20 and 2:30*

After the assaults on officers B.A. and A.W., Dillard exited the East Foyer and entered

the Rotunda at around 2:30 p.m.



*Image 27: Still from Exhibit 4 at :48*

From there, Dillard traveled further into the Capitol, entering Statuary Hall at around

2:31 p.m.

18



*Image 28: Still from Exhibit 5 at :03*

Dillard then went to the Statuary Hall Connector at around 2:47 p.m.



*Image 29: Still from Exhibit 6 at :14*

At around 2:47 p.m. Dillard returned to Statuary Hall.



*Image 30: Still from Exhibit 7 at :09*

Dillard reentered the Rotunda at around 2:50 p.m.



*Image 31: Still from Exhibit 8 at :04*

At around 2:51 p.m., Dillard reentered the East Foyer and exited through the Rotunda Door.



*Image 32: Still from Exhibit 9 at :30*

Dillard spent a total of approximately 25 minutes inside the Capitol.

### *Defendant's Communications Following the Breach*

Dillard's communications after the riot show that he had no remorse for his conduct at the Capitol.

On January 6, 2021, at 4:40 p.m., Dillard received a text asking "[W]hat is going on!?!?" to which Dillard responded, "Stormed the Capitol" and "It was crazy." When another contact later texted concern about Dillard's conduct and suggested he "keep it on the downlow for now," Dillard responded at 5:52 p.m. that "If they are knocking on my door *and we aren't fighting in the streets it's not a country worth living in anyways*." (Emphasis added.) At 10:58 p.m., Dillard texted the same contact, "Yeah I mean I'm being as quiet as I can I guess. *We always knew a fight was*

*necessary.*" (Emphasis added.)

The next day, at 7:21 p.m., Dillard texted another contact who had entered the Capitol with him, stating, "It's been rough listening to all our hero's talk down about what we did." Dillard then texted, "I know it's really crazy. They sight [sic] all the problems with this country then say *but storming the capital was unacceptable.*" (Emphasis added.)

On January 8, 2021, Dillard discussed with a contact the idea of shaving his beard to avoid detection, texting at 9:28 a.m., "I thought about that. . . . but I have a lot of pictures on Instagram of me with a beard."

### *Injuries*

As noted, Dillard slammed Officer B.A. backwards onto the marble floor by the Rotunda Door. Officer B.A. hit the marble floor with his head and shoulders first before sliding into a metal bench. Officer B.A. suffered from vertigo and moments of dizziness for around three months after the riot. Although Officer B.A. could not attribute his head injury to any particular moment during the riot, he stated that when he was thrown backwards by the Rotunda Door, "[T]hat's when it got hazy for me." *See also* Victim Impact Statement, filed under seal.

## III.    THE CHARGES AND PLEA AGREEMENT

On February 15, 2023, a federal grand jury returned an indictment charging Dillard with 10 counts, including violating 18 U.S.C. § 111(a)(1) for his assault of Officer B.A. (Count Two). On July 18, 2023, Dillard was convicted of Count Two based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Dillard now faces sentencing for a violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years' imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100. In the plea agreement, Dillard admitted that his assault involved physical contact with the victim, triggering the felony-level penalties for the violation. *See* 18 U.S.C. § 111(a)(2) (providing for a maximum sentence of eight years where the assault "involve[s] physical contact with the victim.")

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The parties and probation agree that the following Guidelines calculation applies:

Count Two: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Offense Involving Physical Contact | +3 |
| U.S.S.G. § 2A2.4(b)(2) | Victim Sustained Bodily Injury | +2 |
| | | **Total 15** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -2 |
| Total Adjusted Offense Level: | | **13** |

*See* Plea Agreement at ¶ 4(A).[2]

The U.S. Probation Office calculated Dillard's criminal history as category I, which the government does not dispute. PSR ¶ 42. Accordingly, based on the government's calculation of

---

[2] By contrast, under the guidelines for aggravated assault in § 2A2.2, the calculation would be as follows: Base Offense Level of 14, plus a 3-level enhancement for Bodily Injury under § 2A2.2(b)(3), plus a 6-level enhancement for official victim under § 3A1.2(c)(1), minus a 3-level reduction for Acceptance of Responsibility under § 3E1.1, resulting in a Total Offense Level of 20 and an advisory guidelines range of 33 to 41 months.

the defendant's total adjusted offense level, after acceptance of responsibility, at 13, Dillard's Guidelines range is 12 to 18 months' imprisonment, as was estimated in the plea agreement.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a substantial term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Dillard's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Dillard assaulted an officer while he was struggling to prevent a stream of rioters from breaching the Rotunda Door. Dillard threw the officer backwards, who then landed on his head and shoulders on the marble floor and lay there until helped up by another officer. The nature and circumstances of Dillard's offense were of the utmost seriousness, and fully support the government's recommended sentence of 18 months.

### B.    The History and Characteristics of the Defendant

Dillard is a 27-year-old manager. From 2014 to 2019, Dillard served in the U.S. Marine Corps. While his service is commendable, in this case it is a double-edged sword. As a former Marine, Dillard knew better than most the danger facing the police from the angry mob. His conduct, including his assault on two uniformed officers, as part of an effort to interfere with the peaceful transfer of power, was a violation of his military oath and a betrayal of his promise to protect this country.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Dillard's criminal conduct on January 6 was the epitome of disrespect for the law. *See also United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. To date, Dillard has expressed no remorse for his conduct. His text messages immediately after the riot reflected his cavalier attitude towards his violent assault of U.S. Capitol Police officers and participation in the riot, stating that even if law enforcement "came knocking on my door and we aren't fighting in the streets it's not a country

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

worth living in anyways." Dillard celebrated his violent participation in the riot ("We always knew a fight was necessary"), and bemoaned others who questioned the riot ("It's been rough listening to all our hero's [sic] talk down about what we did."). Dillard further considered how to avoid detection by law enforcement, including by potentially shaving his beard. Dillard's statements demonstrate that this his sentence must be sufficient to provide specific deterrence from committing future crimes of violence.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how

other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[5]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Joshua Hernandez*, 21-cr-42 (CRC),[6] the defendant attacked officers guarding the interior of the Rotunda Door by encouraging his fellow rioters to group-push against

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hr'g Tr. at 24–25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[6] In both the *Hernandez* and *Willden* cases cited here, the defendants were sentenced under U.S.S.G. § 2A2.2, applicable to aggravated assault. In this case, consistent with the plea agreement, the government is not requesting a sentence of greater than 18 months, since, as noted, the plea agreement in this case incorrectly utilizes U.S.S.G § 2A2.4 instead of § 2A2.2.

(cont'd on next page)

the officers, ultimately forcing the doors behind them open and allowing dozens more rioters to stream in. During this mob push, Hernandez struck an officer's helmet with a flagpole. Judge Cooper sentenced Hernandez to 24 months' incarceration.[7] *See Hernandez*, Feb. 3, 2023 Minute Entry.

Like Hernandez, Dillard assaulted officers guarding the Rotunda Door, a sensitive area of the Capitol. In doing so, Dillard, like Hernandez, facilitated the breach of the police line, additional assaults on officers, and further dispersal of rioters throughout the Capitol.

As another example, in *United States v. Willden*, 21-cr-423 (RC), the defendant joined a mob attempting to breach a line of police officers guarding the Rotunda Door. Willden succeeded in breaching this police line after discharging a chemical spray in the direction of the officers. Both Willden and Dillard utilized the means available to them—*i.e.*, Willden with his spray; Dillard with his body—to achieve the same goal of penetrating the Capitol further, regardless of who or what stood in their way. Judge Contreras sentenced Willden to a 24 months' incarceration.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

---

Accordingly, although the *Hernandez* and *Willden* cases involve a different base offense level, they are actually appropriate comparators with Dillard's conduct.

[7] In *Hernandez*, the defendant pleaded guilty to violating both 18 U.S.C. §§ 111(a) and 231, which grouped under Sentencing Guidelines §§ 3D1.2(c) and 3D1.3(a).

restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer B.A., did suffer bodily injury as a result of Dillard's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Dillard must pay $2,000 in restitution, which reflects in part the role Dillard played in the riot on January 6.[9] Plea Agreement ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) The parties also agreed that Dillard must pay $34,238.55 in restitution for the damage to the Rotunda Door. *Id.* Dillard's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property . . . including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

of the Capitol and other victim entities. *See* PSR ¶ 104.

**VIII.   CONCLUSION**

      For the reasons set forth above, the government recommends that the Court impose a high-end sentence of 18 months' imprisonment, three years' supervised release, restitution of $36,238.55, and a mandatory special assessment of $100.

                    Respectfully submitted,

                    MATTHEW M. GRAVES
                    UNITED STATES ATTORNEY

BY:    /s/_____
           NIALL M. O'DONNELL
           Assistant Chief (Detailed)
           300 N. Los Angeles St., Suite 2001
           Los Angeles, CA 90012
           Ph: (202) 257-3295
           Email: niall.odonnell@usdoj.gov